1  DWIGHT C. DONOVAN (State Bar No. 114785)
   L. PETER RYAN (State Bar No. 134291)
2  MBV LAW LLP
   855 Front Street
3  San Francisco, CA 94111
   Telephone:   (415) 781-4400
4  Facsimile:    (415) 989-5143

5  Attorneys for Plaintiff
   THINKEQUITY PARTNERS LLC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| THINKEQUITY PARTNERS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>DATATEL, INC., a Virginia Corporation,<br><br>Defendant. | Case No.  C-05-2810 SBA<br><br>**ORDER GRANTING PLAINTIFF THINKEQUITY PARTNERS, LLC'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT DATATEL, INC.'S MOTION FOR SUMMARY JUDGMENT** |

This matter comes before the Court on the cross motions of Plaintiff THINKEQUITY PARTNERS and Defendant DATATEL, INC. for summary judgment.  Upon reviewing the pleadings and papers on file herein, and good cause appearing therefor, THINKEQUITY's motion for summary judgment is hereby GRANTED, and DATATEL's motion is DENIED.

The parties entered into an Agreement dated July 18, 2003, whereby THINKEQUITY agreed to act as DATATEL's exclusive financial advisor in connection with pursuing a potential acquisition by, or sale of, DATATEL.

DATATEL agreed to pay THINKEQUITY a fee of ¾% of the consideration paid in any Sale Transaction concluded during the term of the engagement, or within eighteen months of the engagement's termination.

1  The Agreement was terminable by either party after six months, by the giving of written
2  notice to the other party.  The provisions governing payment of a fee survived termination.

3  DATATEL used the services of THINKEQUITY for approximately one year, after which it
4  terminated the Agreement by written notice dated July 28, 2004.

5  Eight months thereafter, on or about April 5, 2005, DATATEL concluded a transaction
6  whereby Thoma Cressey Equity Partners and others purchased a controlling block of stock in
7  DATATEL.  Thoma Cressey Equity Partners published a press release on its website announcing its
8  "acquisition of software company DATATEL, INC. for $265 million."

9  THINKEQUITY demanded a fee of ¾ percent of the sale consideration.  THINKEQUITY
10 asserts that the Thoma Cressey Equity Partners transaction was a Sale Transaction as defined by the
11 Agreement, and it occurred within eighteen months of the engagement's termination.

12 DATATEL does not dispute that the consideration for the transaction was $265 million, nor
13 does it dispute that the transaction occurred during the eighteen month "tail provision" in the
14 Agreement.  DATATEL concedes that there are no triable issues of fact.

15 DATATEL argues that the Thoma Cressey acquisition does not constitute a Sale Transaction
16 under the terms of the Agreement, and that DATATEL is therefore not obligated to pay
17 THINKEQUITY its fee.  DATATEL concedes in its opposition papers that if the transaction qualifies
18 as a Sale Transaction it is obligated to pay THINKEQUITY a fee.

19 A Sale Transaction is defined by the Agreement as "any sale, merger, joint venture, lease,
20 license or other transaction in which 50% or more of the voting power of the Company or all or a
21 substantial portion of its business or assets are combined with or transferred to another company . . ."

22 DATATEL argues that the term "voting power of the Company" means "voting power of the
23 Company in its subsidiaries."  The Agreement does not contain the language "in its subsidiaries."
24 There is no mention of any subsidiaries of DATATEL anywhere in the Agreement.

25 THINKEQUITY asserts that the term "50% or more of the voting power of the Company"
26 means the voting control of DATATEL, and that since voting control of DATATEL was transferred
27 to Thoma Cressey Equity Partners a Sale Transaction occurred.

28 The interpretation of a contract is a legal function, to be performed by the Court as a matter of

law. Where the terms of an agreement are clear and unambiguous, no extrinsic evidence will be admitted to interpret those terms. The Court determines and enforces the intent of the parties as a matter of law based on the four corners of the agreement.

The parties agreed to be bound by New York law in connection with the interpretation and enforcement of the Agreement. "When interpreting a written contract, the court should give effect to the intent of the parties as revealed by the language and structure of the contract and should ascertain such intent by examining the document as a whole. Effect and meaning must be given to every term of the contract and reasonable effort must be made to harmonize all of its terms. Moreover, the contract must be interpreted so as to give effect to, not nullify, its general or primary purpose." *Village of Hamburg v. American Ref-Fuel Co. of Niagara, L.P.*, 727 N.Y.S.2d 843, 846, 284 A.D.2d 85, 89 (2001).

The Court finds as a matter of law that a Sale Transaction occurred in this instance. Read as a whole, the Agreement clearly reflects the parties' intent that a fee would become payable to THINKEQUITY if a sale of the Company occurred during the engagement or within eighteen months thereafter. The Court construes the term "50% or more of the voting power of the Company" to mean the voting control of the company.

"Voting power of the company" has been used in statutes, court opinions, and corporate governance documents to mean the voting power of the company's shareholders, not the voting power of the company in any subsidiaries. For example, the United States Congress in enacting the Alaska Native Claims Act specifically defined "voting power of a Native Corporation" to include "all outstanding shares of stock that carry voting rights." *See* 43 U.S.C.A. Section 1692b(e). This terminology refers to the voting power of the corporation's shareholders, not the corporation's voting interest in subsidiaries. *See Broad v. Sealaska Corporation,* 85 F.3d 422, 429-30 (9th Cir. 1996). There are numerous instances in which court opinions and corporate governance documents use "voting power of the company" to refer to voting power of a company's shareholders. *See, e.g., Robert Half International, Inc. v. Franchise Tax Board* (1998) 66 Cal.App.4th 1020, 1022, and corporate bylaws cited *verbatim* in *Korean Philadelpha Presbytarian Church v. California Presbytery* (2000) 77 Cal.App.4th 1069, 1076.

Further, "50% or more" of a company's voting power is used to mean voting control of the corporation. For example, California Corporations Code refers to the holders of "50% or more of the voting power of the corporation" in defining the circumstances under which a corporation's controlling shareholders can avoid dissolution. California Corporations Code Section 2000(a).

DATATEL does not dispute that voting control of the Company was transferred in the Stock Purchase Agreement ("SPA") identified at Paragraph 11 of its Answer to the Complaint in this action. Before the SPA was executed, voting control of the Company resided in Ken Kendrick and Tom Davidson. DATATEL Responses to THINKEQUITY Requests for Admissions, Set Two, PDE Ex. D, Admissions B(1), B(2) and B(3). After the SPA was executed, voting control resided in Thoma Cressey Equity Partners. Orlando Bravo Deposition, PDE Ex. G, p. 22; Vernon Hollidge Deposition, PDE, Ex. H, p. 13. As a matter of law, the Court finds that a Sale Transaction occurred when voting control of the Company was transferred through the SPA. The Agreement, read as a whole in a manner that gives effect to, rather than nullifies, its primary purpose, compels this result.

The interpretation urged by DATATEL would lead to a result contrary to the intent of the parties as reflected in the remainder of the Agreement. The term "Sale Transaction" is broadly defined to include a sale, merger, joint venture, lease, license or other transaction. There is no mention whatsoever of any subsidiaries of DATATEL in the Agreement, nor is there any language to suggest that DATATEL was hiring THINKEQUITY for the limited purpose of selling DATATEL's ownership interest in any subsidiaries.

DATATEL does not contest the fact that the consideration for the Sale Transaction was $265 million. Applying the formula in the Agreement, THINKEQUITY is entitled to ¾% of $265 million, or $1,987,500, less an offset of $50,000 for a prepaid retainer.

Under New York law, prejudgment interest on an obligation accrues at the rate of 9% per annum. As of June 5, 2006, the fee payable to THINKEQUITY is $2,140,937.50 inclusive of interest. This figure is accruing interest at the rate of $14,531.25 per month.

The parties dispute THINKEQUITY's entitlement to unreimbursed expenses of $6,094.44. The record before the Court is insufficient to resolve the dispute. Thus, the unreimbursed expenses claim will be referred to a Magistrate Judge of this Court for findings and recommendations.

4

ORDER GRANTING PLAINTIFF THINKEQUITY PARTNERS, LLC'S MOTION FOR SUMMARY JUDGMENT
– CASE NO. C-05-2810 SBA

1    Because the Court has not relied on the evidence objected to by the parties, their evidentiary

2 objections are overruled as moot.

3    For the reasons stated above,

4    IT IS HEREBY ORDERED THAT THINKEQUITY's motion for summary judgment

5 [Docket No. 38] is hereby GRANTED, and DATATEL's motion for summary judgment [Docket No.

6 34] is DENIED.

7    IT IS FURTHER ORDERED THAT THINKEQUITY's request for unreimbursed expenses

8 of $6,094.44 is REFERRED to Magistrate Judge James Larson for Findings and Recommendations.

9 The briefing schedule and scheduling of any hearing relating to the request shall be at the discretion

10 of Magistrate Judge Larson.  Upon completion, the Findings and Recommendations shall be filed

11 with the Clerk of Court and served on the parties in this action.  Within ten (10) days of service of the

12 Findings and Recommendations, any party may serve and file objections thereto, together with notice

13 setting the objections for hearing before this Court.  If no objections are filed within ten days, any

14 objections to Magistrate Judge Larson's Findings and Recommendations will be deemed to be

15 waived and the Findings and Recommendations will become the Order of this Court.

16    IT IS FURTHER ORDERED THAT THINKEQUITY's Motion to Deny Jury Demand of

17 Defendant Datatel, Inc. [Docket No. 22] is DENIED as moot.

18    IT IS FURTHER ORDERED THAT the trial date, as well as all pre-trial dates, are

19 VACATED.  The parties' Stipulation to modify deadlines for submissions re: pre-trial conference is

20 DENIED as moot.

21    IT IS SO ORDERED.

22

23 DATED:  6/27/06                                  _____/s/ Saundra B. Armstrong_____
                                                                  SAUNDRA BROWN ARMSTRONG
24                                                                UNITED STATES DISTRICT JUDGE